IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TRUTHOUT and JEFFREY LIGHT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 12-CV-01660 |
| | ) | |
| DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendant. | ) | |

## SUPPLEMENTAL DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)    I am currently the Section Chief of the Record/Information Dissemination Section

("RIDS"), Records Management Division ("RMD"), formerly at Federal Bureau of Investigation

Headquarters ("FBIHQ") in Washington, D.C., and currently relocated to Winchester, Virginia.   I

have held this position since August 1, 2002.   Prior to joining the FBI, from May 1, 2001 to July

31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law.   In that capacity,

I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and

litigation for the Navy.   From October 1, 1980 to April 30, 2001, I served as a Navy Judge

Advocate at various commands and routinely worked with FOIA matters.   I am also an attorney

who has been licensed to practice law in the State of Texas since 1980.

(2)    In my official capacity as Section Chief of RIDS, I supervise approximately 271

employees who staff a total of ten (10) FBIHQ units and two (2) field operational service center

units whose collective mission is to effectively plan, develop, direct, and manage responses to

requests for access to Federal Bureau of Investigation ("FBI") records and information pursuant to

the FOIA, amended by the OPEN Government ACT of 2007; Privacy Act; Executive Order

13526; Presidential, Attorney General and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives.   The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a.   Specifically, I am familiar with the FBI's responses to FOIA requests that were received by FBIHQ from plaintiffs, seeking access to records pertaining to various "Occupy" movement matters.

(4)     This declaration supplements, and hereby incorporates, the prior declaration submitted in this case by David M. Hardy, dated December 20, 2012 ("First Hardy Declaration"). The purpose of this declaration is to respond to specific issues raised by plaintiffs in their Opposition to Defendant's Motion To Dismiss or, in the alternative, for Summary Judgment ("Opposition"), including the adequacy of the FBI's search and to further elaborate on the FBI's justifications for the withholding of information pursuant to FOIA Exemptions (b)(3) to withhold administrative information on subpoenas, (b)(5), (b)(6), (b)(7)(C), (b)(7)(D) for which plaintiff has provided privacy waivers, and (b)(7)(E).

## ADEQUACY OF SEARCH

(5)     As I previously stated in the First Hardy Declaration, ¶59, the FBI's Central Records System ("CRS") is a centralized FBI records system consisting of administrative,

applicant, criminal, personnel, and other files compiled for law enforcement purposes.   The CRS

currently consists of over 105 million records.   Given its comprehensive nature, the CRS is the

principal search mechanism employed by RIDS to locate records responsive to FOIA requests.

(6)      The mechanism that the FBI uses to search the CRS is the Automated Case Support

System ("ACS"), which itself is comprised of three integrated electronic applications:

Investigative Case Management ("ICM"), Universal Index ("UNI"), and Electronic Case File

("ECF").   As relevant here, RIDS conducted an ACS search for records related to plaintiffs'

FOIA requests using multiple name variations as noted at ¶65 of the First Hardy Declaration,

listing 43 separate search terms.   These searches encompassed records located both at

Headquarters and Field Offices.   These ACS searches would identify any responsive main files as

well as cross-references.   See First Hardy Declaration at ¶60 for explanation of main files and

cross-reference files.   As a result of the ACS search for records, the FBI identified 392 pages of

potentially responsive records.

(7)      In addition, although beyond normal searching policies, the FBI took an additional

step and conducted a text search of the ECF to identify all potentially responsive main and

cross-reference files indexed under the search terms.   See First Hardy Declaration at ¶66.   The

FBI took this extraordinary step to locate all potentially responsive records because of the nature of

the case and to locate any responsive documents.

(8)      Plaintiffs take issue with the fact that the FBI searched only the CRS and did not

conduct separate searches of specific databases.   As explained above, the CRS search the FBI

performed would have identified both potentially responsive "main" files as well as

"cross-reference" files.   As to specific databases, many of those records systems are encompassed

in the CRS.   ACS is not a separate database, but rather serves as the automated search engine used

by RIDS to locate potentially responsive records within CRS.   Moreover, ECF, UNI and ICM are also not separate databases.   Rather, these are three integrated, yet separately functional, automated applications within ACS that support case management functions for all FBI investigative and administrative cases.   In this case, the FBI conducted reasonable searches in the CRS, the system of records most likely to contain records responsive to plaintiffs' requests.

(9)      Plaintiffs also argue that RIDS failed to satisfy their request by not conducting specific searches of records systems including the Electronic Surveillance ("ELSUR") and Physical Surveillance ("FISUR") indices, and several shared drives used by FBI Headquarters and Field Offices.   RIDS's search of the CRS would have in fact identified any such files, if they were to exist in other records systems such as ELSUR.   Further, given the broad search of the comprehensive CRS system, I determined that there is no reasonable basis to search unspecified email systems and such searches would be unduly burdensome.

(10)      In addition, plaintiffs state that the FBI did not conduct a search of "ticklers." However, "tickler files"[1] were a phenomenon associated with earlier times in the FBI and would have been historical in nature.   There is no requirement in the present-day FBI record-keeping system for tickler files to be created or maintained, and records responsive to the requests in this case would normally be indexed to the CRS.   Accordingly, absent an express request to search for a specific, identified tickler file (which may not likely remain in existence), there is no need for the FBI to search for tickler files.

(11)      Plaintiffs also challenge the FBI's search surmising that other documents must exist because of statements made in a Huffington Post article and statements made on a DHS

---

[1] Earlier in the FBI's history, tickler files were maintained informally by FBI personnel.   A "tickler" was defined as a duplicate file containing copies of documents, usually kept by a supervisor, sometimes referred to as a "drop" folder.   Such files, if they existed, would routinely contain documents duplicative of documents indexed in the CRS but may have contained unique annotations not present on the CRS-indexed documents and were therefore of some interest to historians.

e-mail. (Opposition at pgs. 8-9.) The statements made in these items, to the extent they are accurate, do not establish that documents would have necessarily been generated.   Further, plaintiffs also reference a distribution list contained on a released document to challenge the search. A distribution list contained on a release page does not establish that the FBI's search was inadequate.   As previously stated, the FBI conducted reasonable searches in the CRS, the system of records most likely to contain records responsive to plaintiffs' requests.   Thus, if indexed within CRS, a search of the CRS would have located records if they existed at the various offices listed on the distribution list.

## JUSTIFICATION FOR WITHHELD INFORMATION

(12)     As set forth in my first declaration, the FBI explained its justifications for withholding information in this case under Exemptions (b)(3) (as it relates to administrative information on subpoenas); (b)(5); (b)(6), (b)(7)(C), and (b)(7)(D) (as they relate to information for which plaintiffs have provided privacy waivers); and (b)(7)(E) (as it relates to investigative techniques and procedures).   5 U.S.C. § 552 (b)(3), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D) and (b)(7)(E). [2]   The following information supplements the previous justifications and specifically responds to plaintiffs' contentions in their Opposition.

### Exemption (b)(3)

(13)     As stated in my first declaration, "…only that information which explicitly discloses matters occurring before a Federal Grand Jury has been withheld pursuant to Exemption (b)(3)-1."   This Exemption has been asserted on four pages. See First Hardy Declaration at ¶¶98-99.   The FBI's justification for withholding information pursuant to Exemption (b)(3)-1 on

---

[2]   In their Opposition, plaintiffs state that they are not challenging (b)(1), (b)(3) to withhold information identifying records subpoenaed by a grand jury, (b)(3) citing the Bank Secrecy Act or 10 U.S.C. Section 1306, (b)(6), (b)(7)(C), (b)(7)(D) except as noted, (b)(7)(A) for open investigations, (b)(7)(E) to withhold location and identity of FBI Units or case file numbers and redactions of information not responsive or beyond the scope of the requests. See Opposition, pages 9-10.

Bates page Truthout-107 (see Opposition, page 11, citing to Ex. SS at 196) was inadvertently

coded with the wrong explanation.   The code that should have been used for material within that

paragraph was (b)(3)-2, Bank Secrecy Act - 31 U.S.C. § 5319, the explanation for which is set

forth in detail in the Hardy Declaration ¶¶97 and 100-103. Plaintiffs have stated that they are not

challenging redactions pursuant to Exemption (b)(3) based on the Bank Secrecy Act.   See

Opposition, pgs. 9-10.

### Exemption (b)(5)

(14)      The FBI is withholding a one-page document pursuant to Exemption (b)(5) as that

document contains processing information and notes created by FBI FOIA personnel related to the

processing of one of plaintiffs' requests.[3]

(15)      The document has been withheld as it is an internal document containing the

on-going dialogue among and between FBI personnel with regard to the FBI's handling of

plaintiffs' FOIA request and specific issues related to the request.   The deliberative process

privilege of Exemption (b)(5) protects the internal deliberations of the government by insulating

recommendations, analyses, opinions, and other non-factual information comprising the

decision-making process.   In turn, Exemption 5 allows for the withholding of such privileged

material – i.e., material that contains or was prepared in connection with the formulation of

opinions, advice, evaluations, deliberations, policies, proposals, conclusions, or recommendations.

Exemption 5 is predicated on the recognition that release of this privileged information would

inhibit the government's development of policy and stifle its decision-making process.

Furthermore, exempting such documents from disclosure also protects against public confusion

that might result from preliminary disclosure of opinions and information that do not, in fact,

---

[3] The FBI has also withheld this page in conjunction with Exemptions (b)(6), (b)(7)(C), and (b)(7)(E).   This pages is located at Bates page Truthout-392.

reflect the final views or policies of the FBI.   The exemption and privilege together protect not only documents but also the integrity of the deliberative process itself where exposure of the process would result in harm.   The FBI invokes Exemption 5 and the deliberative process privilege because FBI employees would hesitate to offer their candid and conscientious opinions to superiors or coworkers if they knew that their opinions of the moment might be made a matter of public record at some future date, and because such self-censorship would, in turn, degrade the quality of agency decisions by depriving the decision-makers of fully-explored options developed from robust debate.

(16)   The withheld material consists of information reflecting the give-and-take of the deliberative processes of FBI personnel.   In the course of processing FOIA requests, RIDS personnel communicate with each other and others within the FBI, seeking information, providing advice, and offering suggestions.   Similarly, employees within the FBI provide advice and offer suggestions to RIDS personnel related to the processing of FOIA requests.   This information is clearly deliberative.   It is also predecisional because it predates the final disposition of plaintiff's FOIA request.   Thus, the FBI properly protected this information from disclosure pursuant to FOIA Exemption 5.   Contrary to plaintiffs' claim, this internal preliminary information is not information that was discussed in the First Hardy Declaration.   Further, the FBI has determined that it is not possible to segregate information from this page as the current policy is to protect these internal processing notes in full in every case as releasing notes in one case and not in another case can lead to a processing technique that the FBI wishes to protect. See ¶18, for additional explanation.

### Exemptions (b)(6), (b)(7)(C), and (b)(7)(D)

(17)    Although normally requiring a requester to submit a new FOIA request upon the receipt of new information after processing has been completed, the FBI agreed in this case to re-review the responsive documents based on nine additional privacy waivers that plaintiffs provided.   The FBI reviewed the previously processed pages for third party names and information associated with the nine waivers.   As a result of the review, the FBI did not locate any additional material that can be released as those names do not appear in the material that was processed as part of plaintiffs' FOIA requests.

### Exemption (b)(7)(E)

(18)    The FBI has withheld the mention of sensitive law enforcement techniques that the FBI uses to obtain invaluable intelligence information in current criminal and national security investigations.   While the techniques may be known by the public in a general sense, the technical analysis of these sensitive law enforcement techniques, to include the specifics of how and in what setting they are employed, is not generally known to the public.   Revealing the techniques, potential targets of the techniques, and/or the nature of the information gleaned via their use in the context of this material would effectively reveal specifics of how, and in what settings, the techniques are employed.   As a result, criminal targets would be better able to avoid detection by developing countermeasures to circumvent the ability of law enforcement officials to use the techniques, thus rendering them useless to the FBI and other law enforcement agencies. Revealing details about these sensitive law enforcement techniques would compromise a crucial means of collecting intelligence information and severely hamper the FBI's law enforcement efforts to detect and apprehend individuals who seek to violate the United States criminal and national security laws; therefore, this information is appropriately exempt from disclosure

pursuant to Exemption (b)(7)(E).   This exemption has been applied to the following

sub-categories of information: [4]

(a)   *Processing Notes*:   The FBI asserted Exemption (b)(7)(E) to protect analyst notes regarding a FOIA case that involves investigative law enforcement records, as they relate to the FBI's mission to support state and local law enforcement partners.   These records were compiled for law enforcement purposes and readily meets the threshold requirement of Exemption (b)(7). Applying a mosaic analysis, the release of analyst notes in some FOIA cases and not in others could allow requesters to piece together certain pieces of information that would otherwise be protected by exemptions within the actual law enforcement records.   This in turn, could reveal a certain investigative technique or procedure that the FBI is trying to protect.[5]

(b)   *Internal Non-Public Telephone Number*:   Exemption (b)(7)(E) has been asserted to protect an internal non- public telephone number for the Central Florida Intelligence Exchange ("CFIX").   Internal non-public telephone numbers are used daily and routinely by various law enforcement agencies in order to transmit and receive investigatory records during the performance of the CFIX's law enforcement mission.   The relative benefit of these techniques and/or procedures could be diminished if the actual numbers were revealed in these records.   Release of the information could subject members of the CFIX and support personnel to massive, disruptive, and misleading amounts of phone calls as well as harassment and threats.   It could also enable circumvention of the law by allowing criminals to gain access to an internal communication channel used by the CFIX to communicate and transmit information internally and externally with other law enforcement agencies, such as the FBI.   As such, release of these numbers would clearly disrupt official business by impeding the ability of CFIX members and support personnel to conduct and conclude law enforcement investigations in a timely manner.[6]

(c)   *Database and Database information*:   Exemption (b)(7)(E) has been used to protect information that is not well known about public databases and data search results.   The FBI's Guardian Thread Tracking System ("Guardian") is a reporting system used by the FBI to track threats and other intelligence information.   It allows users to enter, assign, and manage terrorism threats and suspicious activities in a paperless environment.   This allows all field offices and Joint Terrorism Task Force ("JTTF") members to view the information simultaneously.   To reveal the

---

[4]   One of the subcategories includes case file numbers and these case file numbers are found on Truthout-7-12, 14-17, 21, 30, 32-34. 37, 39, 41-42, 45-46, 51-52, 65-66, 73-74, 81, 90-95, 98-102, 107-116, 124-126, 130, 132-186, 188-227, 254, 263, 270-275, 279-280, 286-291, 296-299, 302-309, 313-339, 346-352-358, 360-365, 378, and 380-391.   In their Opposition, plaintiffs state that they are not challenging the redaction of case file numbers. (See Opposition, page 10.)   Thus, additional explanation is not provided for these redactions.

[5]   Exemption (b)(7)(E)-1, category (a) has been asserted on Truthout-392.

[6]   Exemption (b)(7)(E)-1, category (b) has been asserted on Truthout-120.

characteristics and data that are collected and tracked using this system could allow offenders to circumvent discovery because the FBI will use the same or similar techniques and/or assistance to bring future investigations to successful conclusions.[7]

(d)     *Web Site Address of Information Management Database*:  Exemption (b)(7)(E) has been asserted to protect internal web pages utilized by various FBI divisions and field offices for transfer of information.   Internal web site addresses relate to the internal practices of the FBI in that they are utilized daily by FBI personnel during the performance of their jobs.   Disclosure of this type of information could disrupt official business (including impeding the ability of SAs to conduct and conclude law enforcement investigations in a timely manner).[8]

(e)     *Collection and/or Analysis of Information*:   The DIOG describes numerous methods that the FBI uses to collect and analyze the information that it obtains for investigative purposes.   Although the fact that the FBI collects certain types of information is known to the public, the manner in which the FBI applies and analyzes this information for use in its investigations and for intelligence purposes is not publicly known.   Since 9/11 and especially after the enactment of the Intelligence Reform and Terrorist Prevention Act of 2004 (IRTPA), the FBI has been transforming itself into an intelligence-driven agency to aid its paramount mission of detecting and preventing harm to the national security before it happens. Two essential components of this effort - indeed the sine qua non of this mission-- are the collection and analysis of information.   The FBI has fully described this new mandate under IRTPA to the American public--but it has not disclosed the precise methods used in the collection and analysis of information.   Such disclosures would enable subjects of FBI investigations to circumvent similar, currently used techniques.   The relative utility of these techniques could be diminished if the actual techniques were released in this matter.   This, in turn, would facilitate the accumulation of information by investigative subjects regarding the circumstances under which the specific techniques can be used or requested and the usefulness of the information obtained.   To release this type of information would enable criminals, terrorists, and spies to educate themselves about the techniques employed for the collection and analysis of information that information would improve the ability of such individuals to take countermeasures to circumvent the effectiveness of the techniques and to continue to violate the law and engage in intelligence, terrorist, and criminal activities.[9]

(f)     *Specific law enforcement techniques utilized to conduct national security and intelligence investigations*:   Exemption (b)(7)(E) was asserted to withhold information pertaining to law enforcement techniques used to conduct national

---

[7]  Exemption (b)(7)(E)-1, category (c) has been asserted on Truthout-12-21, 30-81, 91, 124-131, 135-136, 227-263, 281, 310-312, 318-319, 326, 336, and 348-352.

[8]  Exemption (b)(7)(E)-1, category (d) has been asserted on Truthout-286, 299-300, 336, and 378.

[9]  Exemption (b)(7)(E)-1, category (e) has been asserted on Truthout-1-6, 95-100, 102-105, 107, 342, 369-377, and 379.

security and intelligence investigations.  Release of the details of specific law enforcement techniques utilized by the FBI to conduct national security and intelligence investigations could aid individuals in circumventing the law and promoting the invention of countermeasures which would divert the FBI's investigative methods from its intended target.[10]

(g)   *Intelligence Analyst Analytical Technique and Procedures*:  Exemption (b)(7)(E) has been asserted to protect procedures and techniques used by the CFIX to conduct national security investigations.  Specifically, FOIA Exemption (b)(7)(E) is being asserted to protect the information contained within a monthly report and analysts' notes in regards to their interpretation and/or analysis regarding the investigation at issue.  Disclosure of these analytical techniques and procedural methods could enable subjects of investigations to circumvent the law by disclosing the very analytical processes, patterns, and techniques used by law enforcement in its law enforcement mission to develop investigations.  The relative benefit of these analytical techniques and procedures would be diminished if the actual techniques and procedures were revealed in these records.  This in turn could facilitate the accumulation of information by other investigative subjects regarding the circumstances and direction under which these techniques and procedures were used or requested and the value of the information obtained.  It could also enable criminals to educate themselves about the law enforcement investigative techniques and procedures employed for the location and apprehension of individuals and therefore allow these individuals to take countermeasures to circumvent the effectiveness of these techniques and procedures and to continue to violate the law.  Additionally, the CFIX report has a footer with the following language: "This document is the property of the Central Florida Intelligence Exchange (CFIX) and may be distributed to Federal, State and Local Law Enforcement, DoD and U.S. Intelligence Community personnel.  No portion of this document should be released to the public, the media, or other personnel who do not have a valid need-to-know without prior authorization from CFIX.[11]

## THE FBI RELEASED ALL SEGREGABLE INFORMATION

(19)   As stated in my First Declaration, the FBI made every effort to provide plaintiffs with all material in the public domain and with all reasonably segregable portions of released material.  The FBI determined that with regard to the exempt information, the material is properly subject to a FOIA exemption or so intertwined with protected material that segregation is not possible without revealing the underlying protected material.  See First Hardy Declaration at ¶68.

---

[10]  Exemption (b)(7)(E)-1, category (f) has been asserted on Truthout-1-10, 90-91, 95-97, 102-105, 107, 140-145, 151, 173-175, 186, 292, 294, 302-303, 314, and 386.

[11]  Exemption (b)(7)(E)-1, category (g) has been asserted on Truthout-117 and 120.

11

## FACTUAL ISSUES RAISED BY PLAINTIFFS AND CLAIM THAT FBI DELAYED RELEASE OF RECORDS

(20)     Plaintiffs state that they did not receive the FBI's response letter of April 24, 2012, in regard to FOIPA 1182695, seeking the processing notes related to an earlier FOIA request. (Opposition at pg. 2.)  The FBI has reviewed the response letter and has verified that the letter contained the correct address.  The FBI's records show that this letter was mailed on April 24, 2012, and the FBI has not located any record indicating that the letter has been returned to the FBI.

(21)     In reviewing plaintiffs claim that the FBI released two pages to other requesters but not to them, the FBI has subsequently determined that the document in which these pages were located was incorrectly excluded from the plaintiffs' release as they were believed to be outside the scope of plaintiffs' requests.   During the administrative phase, the FBI believed that this document was outside of the date range of plaintiffs' requests.   Upon re-review of the material, it has been determined that this document is responsive to FOIPA 1191931.  As a result, the FBI has attached this document as Exhibit A to this declaration.  Further, the FBI has checked the parameters of the search to determine if any other documents had been inadvertently excluded and has determined that the search parameters were accurate and that the only excluded pages were the document attached as Exhibit A.

(22)     Plaintiffs claim that FBI personnel acted "arbitrarily and capriciously" to delay the release of records to plaintiffs.  (Opposition at pg. 15.)  Plaintiffs note that the FBI made releases to other requesters before they released records to plaintiffs, even though the other requesters' letters were dated after plaintiffs.   The other requesters that plaintiffs mention (ACLU-NC and PCJF) only had one request each.   Plaintiffs had five FOIPAs that required releases be made. The FBI meticulously reviewed the material that was deemed responsive to requests for various "Occupy" movement matters for each of plaintiffs' requests.   Since some of plaintiffs' requests

were specific, in either dates or types of material for which they were seeking, it took the FBI some time to remove any material that was not responsive to each individual request, as evidenced by a separate release for each FOIPA.   The FBI's actions were neither arbitrary nor capricious.

## CONCLUSION

(23)    The FBI has released to plaintiffs all reasonably segregable, nonexempt information responsive to plaintiffs' FOIA requests subject to this litigation.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and that Exhibit A attached hereto is a true and correct copy.

Executed this _____ day of May, 2013.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Winchester, Virginia

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TRUTHOUT and JEFFREY LIGHT,    )
                               )
        Plaintiffs,            )
                               )
        v.                     )    Civil Action No. 12-CV-01660
                               )
DEPARTMENT OF JUSTICE,         )
                               )
        Defendant.             )

**EXHIBIT A**

**FEDERAL BUREAU OF INVESTIGATION**
**FOIA/PA DELETED PAGE INFORMATION SHEET**

_____   Page(s) withheld entirely at this location in the file.  One or more of the following
statements, where indicated, explain this deletion.

☐  Deletions were made pursuant to the exemptions indicated below with no segregable
material available for release to you.

| Section 552 | | Section 552a |
|---|---|---|
| ☐(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☐(b)(7)(C) | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☐(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ☐(b)(5) | ☐(b)(9) | ☐(k)(6) |
| ☐(b)(6) | | ☐(k)(7) |

☐  Information pertained only to a third party with no reference to the subject of your request
or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were
referred to that agency(ies) for review and direct response to you.

_____   Page(s) contain information furnished by another Government agency(ies).  You will be
advised by the FBI as to the releasability of this information following our consultation with
the other agency(ies).

_____   Page(s) withheld inasmuch as a final release determination has not been made.  You will be
advised as to the disposition at a later date.

_____   Page(s) were not considered for release as they are duplicative of _____.

___3___   Page(s) withheld for the following reason(s):  Pages deemed not responsive by USCG

☐  The following number(s) is (are) to be used for reference regarding these pages:
Truthout-393-395 _____

XXXXXXXXXXXXXXXXXXXX
X    Deleted Page(s)        X
X    No Duplication Fee   X
X    for this page             X
XXXXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX



Outside the Scope per Coast Guard

C. (U) PROTESTORS TEMPORARILY SHUT DOWN PORT OF OAKLAND, CA.
THOUSANDS OF PROTESTORS FLOODED DOWNTOWN OAKLAND, CA, ON 2
NOVEMBER
2011 TO PARTICIPATE IN A GENERAL STRIKE CALLED BY THE OCCUPY
OAKLAND MOVEMENT TO PROTEST ECONOMIC INEQUALITY AND CORPORATE

GREED. THE PROTESTORS MARCHED IN FORCE TO THE PORT OF OAKLAND, THE

NATION,S FIFTH-BUSIEST SHIPPING PORT, WITH THE INTENTION OF
DISRUPTING PORT OPERATIONS. POLICE ESTIMATED NEARLY 7,000 PEOPLE
CLOGGED THE MAIN PORT ENTRANCE ON MIDDLE HARBOR ROAD AND AT SEVEN

OTHER GATES, CHANTING SLOGANS AND HALTING ALL TRUCK TRAFFIC IN AND

OUT OF THE PORT. RUMORS HAD SPREAD THROUGHOUT THE CROWD THAT
MANY
PORT WORKERS FAILED TO ARRIVE FOR THEIR MORNING SHIFTS.
-
(U) ABOUT 40 OUT OF 325 PORT WORKERS DID NOT REPORT FOR THE DAY
SHIFT ON 2 NOVEMBER, ACCORDING TO THE UNION REPRESENTING THE PORT

WORKERS, WHICH DID NOT AUTHORIZE A STRIKE. PORT OFFICIALS STRESSED
~
~
PAGE 07 RUCOWCA0519 UNCLAS FOUO
THAT ALL SEVEN MARITIME TERMINALS WERE CONDUCTING NORMAL
OPERATIONS

DURING THE DAY. DOZENS OF PROTESTORS CLIMBED UP ON IDLED TRUCKS
WAVING SIGNS AND YELLING SLOGANS.  THE FEW POLICE WHO MONITORED THE

SITUATION KEPT A CONSIDERABLE DISTANCE.  THE PORT OF OAKLAND SHUT
DOWN AT 1815 WHEN THE PORT EXECUTIVE DIRECTOR DECIDED THE LARGE
NUMBER OF PROTESTERS POSED A DANGER TO THE SEVERAL HUNDRED
WORKERS
STILL INSIDE THE PORT. (SFGATE, 03 NOV 11), (NEW YORK TIMES, 03 NOV
11), OAKLAND TRIBUNE, 02 NOV 11).

(U//FOUO) ANALYST COMMENT: THE PROTESTORS, ACTIONS SHUT DOWN THE

PORT OF OAKLAND FOR MORE THAN 14 HOURS.  IF THIS MOVEMENT WERE TO
SPREAD TO THE PORT OF LONG BEACH, THE SECOND BUSIEST PORT IN THE
UNITED STATES, THE DISRUPTION OF PORT OPERATIONS RESULTING IN CARGO

REACHING THEIR REQUIRED DESTINATIONS LATE COULD HAVE MUCH MORE

SERIOUS EFFECTS ON THE SUPPLY CHAIN NETWORK IN THE UNITED STATES.

D. (U//FOUO)



Outside the Scope per Coast Guard

**FEDERAL BUREAU OF INVESTIGATION**
**FOIA/PA DELETED PAGE INFORMATION SHEET**

_____        Page(s) withheld entirely at this location in the file.  One or more of the following
              statements, where indicated, explain this deletion.

              ☐ Deletions were made pursuant to the exemptions indicated below with no segregable
              material available for release to you.

|                  | **Section 552** |                  |                  | **Section 552a** |
|------------------|-----------------|------------------|------------------|------------------|
| ☐(b)(1)          |                 | ☐(b)(7)(A)       |                  | ☐(d)(5)          |
| ☐(b)(2)          |                 | ☐(b)(7)(B)       |                  | ☐(j)(2)          |
| ☐(b)(3)_____ |                 | ☐(b)(7)(C)       |                  | ☐(k)(1)          |
| _____|                 | ☐(b)(7)(D)       |                  | ☐(k)(2)          |
| _____|                 | ☐(b)(7)(E)       |                  | ☐(k)(3)          |
| _____|                 | ☐(b)(7)(F)       |                  | ☐(k)(4)          |
| ☐(b)(4)          |                 | ☐(b)(8)          |                  | ☐(k)(5)          |
| ☐(b)(5)          |                 | ☐(b)(9)          |                  | ☐(k)(6)          |
| ☐(b)(6)          |                 |                  |                  | ☐(k)(7)          |

              ☐ Information pertained only to a third party with no reference to the subject of your request
              or the subject of your request is listed in the title only.

              ☐ Document(s) originated with another Government agency(ies).  These documents were
              referred to that agency(ies) for review and direct response to you.

_____        Page(s) contain information furnished by another Government agency(ies).  You will be
              advised by the FBI as to the releasability of this information following our consultation with
              the other agency(ies).

_____        Page(s) withheld inasmuch as a final release determination has not been made.  You will be
              advised as to the disposition at a later date.

_____        Page(s) were not considered for release as they are duplicative of _____.

__2__         Page(s) withheld for the following reason(s):  Pages deemed not responsive by USCG_____

              ☐ The following number(s) is (are) to be used for reference regarding these pages:
Truthout-398-399_____                _____

                                                    XXXXXXXXXXXXXXXXXXX
                                                    X     Deleted Page(s)     X
                                                    X     No Duplication Fee   X
                                                    X        for this page      X
                                                    XXXXXXXXXXXXXXXXXXX
XXXXXX
XXXXXX